IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re BANK OF NEW YORK MELLON CORPORATION FALSE CLAIMS ACT FOREIGN EXCHANGE LITIGATION,

*Ex rel.* FX ANALYTICS, LOS ANGELES COUNTY EMPLOYEE RETIREMENT ASSOCIATION, LOS ANGELES DEPARTMENT OF WATER & POWER RETIREMENT PLAN, SAN DIEGO COUNTY EMPLOYEES RETIREMENT ASSOCIATION, and STANISLAUS COUNTY EMPLOYEE RETIREMENT ASSOCIATION,

Plaintiff/Relator/Intervenors,

v.

THE BANK OF NEW YORK MELLON CORPORATION, BANK OF NEW YORK MELLON TRUST COMPANY, N.A., and DOES 1 through 100, inclusive,

Defendants.

No. C 11-5683 WHA

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

In this action for breach of contract and related claims, defendants move to dismiss. For the following reasons, defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

*Qui tam* plaintiff (or "relator") FX Analytics, a Delaware general partnership, filed this action under seal in Alameda County Superior Court pursuant to the California False Claims Act

("CFCA"). Under the CFCA, a person with independent knowledge of the facts may bring a *qui tam* action for and in the name of a political subdivision. The suit is filed under temporary seal and the *qui tam* plaintiff must immediately notify the Attorney General and disclose all pertinent information in the plaintiff's possession. The Attorney General must then provide similar notice and disclosure to the prosecuting authority of the affected political subdivision. After investigation, the pertinent official or officials may intervene in the *qui tam* suit and assume control of the action. The *qui tam* plaintiff may remain a party. *State ex rel. Harris v. PricewaterhouseCoopers, LLP*, 39 Cal. 4th 1220, 1228 (2006).

FX Analytics brings this action on behalf of several California entities: (1) the Oakland Police and Fire Retirement System Fund; (2) Santa Barbara County and the Santa Barbara County Employees Retirement System Fund; (3) San Luis Obispo and the San Luis Obispo County Employees Retirement Plan; (4) Merced County and the Merced County Employees Retirement System Fund; (5) Mendocino County and the Mendocino County Employees Retirement Association Defined Benefit Fund; (6) Tulare County and the Tulare County Employees Retirement Association Fund; (7) the City of Los Angeles and the Los Angeles Water and Power Employees Retirement Plan ("LAWPER"); (8) Los Angeles County and the Los Angeles County Employees Retirement Association Fund ("LACERA"); (9) San Diego County and the San Diego County Employees Retirement Association Fund ("SDCERA"); and (10) Stanislaus County and the Stanislaus County Employees Retirement Association Fund ("SCERA").

LAWPER, LACERA, SDCERA and SCERA subsequently intervened in this action. Intervenors allege violations of the CFCA as well as unjust enrichment, breach of contract, breach of fiduciary duty, fraud by concealment, and violations of California Business and Professions Code Section 17200. In November 2011, defendants removed this action to this district (Dkt. No. 1 ¶¶ 1, 6).

The third amended complaint, the operative complaint, alleges the following: The funds individually contracted with defendants or their successors for custodial services. These agreements designated defendants or their successors as fiduciaries on behalf of the funds.

Between fifteen and twenty percent of each funds' custodial assets were invested in foreign securities. Because foreign investments were purchased and sold in the currencies in which they were issued, the funds had to buy and sell those foreign currencies to effect orders. As a part of their services, defendants agreed to execute the foreign exchange ("FX") transactions necessary to facilitate the funds' purchases of foreign securities. Each of the funds was allegedly induced by defendants to select the "standing-instruction" method of execution for their FX transactions. Under standing instructions, when the funds bought foreign securities or received interest from those securities, defendants would, without the funds' direct involvement, convert the necessary currency to make that transaction possible (Third Amd. Compl. ¶¶ 56–61).[*]

Exchange rates were set by the FX market. Each day, defendants' FX traders were alerted to the total required standing instruction trades to fulfill that day's foreign securities transactions. To cover those transactions, defendants' traders would execute trades on the interbank FX market. Once the currency had been acquired, the traders processed an internal, "intra-desk" trade. Pricing was assigned by the FX transaction desk for this trade. To assign price, the FX transaction desk looked to the published "range of the day" for the currency. The "range of the day" set a window for the prices that could be assigned to standing instruction trades under the agreements.

If the standing instruction trade was a "buy," defendants assigned the highest price of the day's range. If the standing-instruction trade was a "sell," defendants assigned the lowest possible price. The difference in price actually paid by the bank on the interbank market and the price assigned by the FX transaction desk ("markup" or "markdown") was kept as an undisclosed profit by defendants. By assigning price while acting as both buyer and seller, defendants were able to designate and thus maximize this profit. Profits garnered under this system were ten to twenty times greater than in a directly negotiated (not standing-instruction) arrangement (*id*. at ¶¶ 73–85).

---

[*] Relator FX Analytics, on behalf of the several California entities, and intervenors are referred to collectively herein as "plaintiffs."

3

The transaction desk did not consult with or contact the government funds in any way prior to pricing the FX transactions. Monthly reports were sent to the funds, reflecting only the prices assigned by the FX transaction desk for each trade. Because no time-stamps accompanied those prices, the funds could not check the assigned prices against the published rates for the times of the trades (*id.* at ¶¶ 84–85).

Plaintiffs allege several misrepresentations made by defendants in order to induce the funds to enlist their custodial services. For example, according to plaintiffs, defendants expressly represented in their proposal to LAWPER that: (1) they would assume a fiduciary responsibility "that all of [the fund]'s assets are properly held in safekeeping and that all assets are accurately reported in our accounting system"; (2) they were "able to accommodate all essential custodial services in the foreign markets in which [the fund] is invested"; (3) defendants' "Institutional Accounting and Reporting System" would "accurately account for all securities . . . in both base and local currency"; (4) defendants had an "extensive foreign exchange division," and would "provide investment managers of [their] clients with access to one of the most competitive and efficient foreign exchange operations in the country"; (5) through their foreign exchange division, defendants would "strive to provide extremely competitive market drive rates, while ensuring an accurate and efficient settlement process"; (6) the competitiveness of defendants' rates was "ensured through a range discrepancy report that the manager of the foreign exchange division receives daily." That report enabled senior management to "review foreign exchange rate process" and to verify that the rates are competitive (*id.* at ¶¶ 37–39).

Plaintiffs also allege several misrepresentations by defendants specific to the FX standing instruction service. Before 2009, defendants' website allegedly stated:

> Standing Instruction trading provides a simple, flexible and complete service solution that automates the capture of all types of custody-related foreign exchange . . . Operationally simple, *free of charge* and integrated with the client's activity on the various securities markets, FX standing instruction is designed to help clients *minimize risks and costs* related to the foreign exchange and concentrate on their core business.

4

1  (*id.* at ¶ 31) (emphasis added).  The site further represented that "standing instruction [FX]

2  clients benefit from [FX] according to best execution standards" (*ibid.*).

3        Plaintiffs allege that defendants' representations "had and have little or nothing to do

4  with its actual practices toward the affected custodial clients."  Specifically, defendants' alleged

5  scheme resulted in failure to provide competitive rates as required under their contracts.

6  Despite contrary representations to the funds, defendants failed to disclose the true prices

7  received for currency trades made in the custodial accounts (*id.* at ¶ 35).

8        **ANALYSIS**

9      **1.**    **STANDARD OF REVIEW.**

10        To survive a motion to dismiss, a complaint must contain sufficient factual matter,

11  accepted as true, to state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*,

12  129 S. Ct. 1937, 1949 (2009).  A claim is facially plausible when there are sufficient factual

13  allegations to draw a reasonable inference that defendants are liable for the misconduct alleged.

14  While a court "must take all of the factual allegations in the complaint as true," it is "not bound

15  to accept as true a legal conclusion couched as a factual allegation."  *Id.* at 1949–50 (quoting

16  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "[C]onclusory allegations of law and

17  unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."

18  *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

19      **2.**    **VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT.**

20        Plaintiffs seek compensatory damages, trebled, and civil penalties arising from the

21  payment of inflated FX rates by the government funds.  Plaintiffs allege violations of

22  Sections 12651(a)(1), (a)(2)–(3), and (a)(7) of the CFCA.  The CFCA is intended to "prevent

23  false requests or demands that impact the public treasury."  Because the CFCA was drafted

24  to match the Federal False Claims Act, it is appropriate to look to precedent construing the

25  equivalent federal act.  *State v. Altus Finance, S.A.*, 36 Cal. 4th 1284, 1291 (2005).

26  The allegations of a CFCA complaint must be pleaded with particularity.  Under this standard,

27  the complaint must plead "the time, place, and contents of the false representations, as well as

28  the identity of the person making the misrepresentation and what he obtained thereby."  *Ibid*.

### A. Section 12651(a)(1) Claim.

Under Section 12651(a)(1) of the CFCA, liability falls on any person who "knowingly presents or causes to be presented a false or fraudulent claim for payment or approval." Liability under the CFCA is premised on presentment of a "claim." Section 12650(1) defines a "claim" under the CFCA as "any request or demand, whether under a contract or otherwise, for money, property, or services . . . that is presented to an officer, employee, or agent of the state or of a political subdivision." CAL. GOV'T CODE § 12650 (2010). In deciding whether a statement is a "claim or demand for payment," a court should address whether the statement "has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." Not all fraudulent statements, however, are "claims" under the CFCA. Our court of appeals, construing the parallel federal statute, has stated: "[I]f the Act were intended to cover any and all attempts to cheat the United States, we doubt that the Congress would have used the word 'claim' to specify such an intent." *United States v. Howell*, 318 F.2d 162, 165 (9th Cir. 1963).

Plaintiffs acknowledge the statute's focus on the "claim" itself but allege that defendants, by sending monthly reports reflecting fictitious rates for FX trades, knowingly presented false or fraudulent claims for payment (Opp. 12–13). Plaintiffs argue that, because the funds had a "contractual right to challenge the statements if they appeared to be incorrect," they were meaningful "claims" under the statute. The funds' continued use of the standing instruction service was allegedly contingent on their approval of the prices contained in the monthly reports (*ibid.*).

Defendants argue that plaintiffs' complaint, taken as true, fails to allege presentment of a "claim" for payment or approval by an officer or employee of a political subdivision. This order agrees. Controlling is *Fassberg Construction Co. v. Housing Authority of Los Angeles* 151 Cal. App. 4th 267 (2007), which distinguished between a "claim for a payment or approval" and a "record or statement." In *Fassberg*, a contractor was hired by a housing authority to construct residential buildings. The contract provided for periodic progress payments, which were to be accompanied by a certification that the amounts requested were for performance "in accordance with the contract specifications." Fassberg agreed to submit weekly

6

payroll reports stating the wages paid to each worker.  In addition, the contract allowed Fassberg to make "change order proposals" to account for alterations in the scope of work.  The housing authority alleged that Fassberg had falsified information in "change order proposals" in order to increase the amount owed under the contract.  The *Fassberg* court held that the CFCA authorizes a civil penalty for a false "claim" but not for a "false record or statement."  In so finding, the court stated that the statute's plain meaning "clearly distinguishes a 'false claim' from a 'false record or statement' and authorizes a civil penalty only for each false claim."  The court concluded that a change order proposal was not a "claim" under the CFCA, but rather a "record or statement" made or used to "get a false claim paid or approved."  *Id.* at 395.

The monthly reports containing the prices paid for standing instruction FX transactions, even if implicitly "approved" by the government funds by their continued use of the service, cannot alone constitute "claims" under the CFCA.  No demand for payment or approval was allegedly contained in the monthly reports; plaintiffs only assert that the fraudulent pricing scheme *amounted to* demands for payments.  The bare assertion that the monthly reports "constituted claims for plaintiffs to make wrongful payments and were not merely false statements related to defendants' scheme" does not cure this defect in pleading.

Plaintiffs state that *Fassberg* is inapposite, pointing to the "overarching payment scheme analyzed in that case," in which the contractors submitted progress payment requests in order to obtain payment.  Here, it is said, defendants' monthly reports were not mere records to support a prior or subsequent claim for money but "constituted a claim in and of themselves." This distinction is vague.  It appears to rest on the fact that because certain of Fassberg's progress payment requests were deemed to be "claims for payment," the *Fassberg* court's finding that the payroll reports and change order proposals were not "claims" is insignificant. Not so.  The existence of a separate "claim for payment" does not determine whether *these* monthly reports can constitute "claims" under the CFCA.  Plaintiffs have failed to allege that the reports constituted "requests or demands for money property or services" as required by the CFCA.

7

At the hearing, plaintiffs cited several decisions in support of their CFCA allegations. None of these decisions specifically addressed the question of whether a "claim for payment" was presented by the defendant. In *City of Pomona*, the defendant submitted invoices to the government. *City of Pomona v. Superior Court*, 89 Cal. App. 4th 793, 803 (2001). The fact that the defendant's false statements were made in catalogues, and not directly on the invoices, does not change that invoices were actually presented for payment. Invoices were also presented by the defendant in *United States v. Dynamic Research*, No. 03-CV-11965, 2008 WL 886035 at *9 (D. Mass. 2008). The district court in *Dynamic Research* specifically stated that liability under the FCA attaches "not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." Similarly, *Ven-A-Care* involved a defendant who had fraudulently submitted claim forms for reimbursement. *California ex. rel. Ven-A-Care v. Abbott Labs, Inc.* 478 F. Supp. 2d 164 (D. Mass. 2007). None of these decisions relieve plaintiffs of the CFCA's claim requirement.

Finally, plaintiffs assert that "even if the Court were to conclude that the monthly bills at issue were not claims or demands for payment, the monthly reports nonetheless constitute actions and activities that are in and of themselves sufficient to constitute violations of the CFCA." In support of this proposition, plaintiff cites to *Laidlaw Transit*, *Inc*. and *Urban Investment Trust*. Neither of these decisions supports plaintiffs' contention that the "claim" requirement of the CFCA may be circumvented. In *Laidlaw*, there was no dispute that the allegedly fraudulent invoices constituted "claims." *See San Francisco Unified School Dist. ex rel. Contreras v. Laidlaw Transit, Inc*., 182 Cal. App. 4th 438, 448 (2010). *Urban Investment Trust* is even less applicable. The court was not there presented with the merits of FCA allegations, but rather the sufficiency of that plaintiff's allegation of retaliation by her employer. That analysis required only a good faith belief on the part of the employee that the employer had advanced fraud against the government. No finding as to the presentment of a "claim" or any other basis for FCA liability was addressed. *See United States ex rel. Howard v. Urban Investment Trust*, No. 3 CV 7668, 2007 U.S. Dist. LEXIS 76010 (N.D. Ill. 2007).

This order holds that the monthly reports constituted "reports" and not "claims" under even a broad reading of the CFCA. Accordingly, defendants' motion to dismiss plaintiffs' claim under CFCA Section 12651(a)(1) is **GRANTED.**

### B. Section 12651(a)(7) Claim.

Section 12651 prohibits "reverse false claims" against the government. A person will be liable if he:

> Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

CAL. GOV'T CODE § 12651(a)(7). For a reverse false claim to attach, the obligation to pay or transmit money or property must be certain and liquidated. In order to be subject to the CFCA, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness. *State ex rel. Bowen v. Bank of America*, 126 Cal. App. 4th 225, 240 (2005).

In *State ex. rel. McCann v. Bank of America*, 191 Cal. App. 4th 897 (2011), the court reviewed a reverse false claim allegation premised on an allegedly false banking practice. There, the bank was accused of failing to escheat "unidentified" bank deposits to the state pursuant to statute. The court held that (*id.* at 910):

> While Appellants identified a practice they alleged to be fraudulent (i.e., failure to investigate unidentified credits and to then credit them to presenting banks), they still fail, as the trial court noted, to allege the existence of any legal obligation for [the bank] to do otherwise, or to directly identify an amount or account — a liquidated and certain obligation—due to any specified presenting bank (in California or elsewhere) that would be subject to escheat under the [relevant statute]. Whether viewed as a lack of pleading specificity, or as a substantive defect in failure to allege a necessary element of their cause of action, it is fatal to the complaint in either instance.

The court expressly distinguished undefined contractual claims from specific remedies, stating that "money is not 'owed' without a specific contract remedy, a judgment or an acknowledgment of indebtedness." Under this standard, the court found that plaintiffs had failed to show that the

9

bank "held or owed a specific and liquidated legal obligation 'payable or distributable' to some person or entity." *Ibid.* Other California appellate districts have similarly ruled such allegations insufficient to state a claim under the CFCA.

Plaintiffs allege that defendants "undertook a series of obligations based upon the contracts and representations made by defendants to induce [the funds] to enter those contracts. Those obligations required, at a minimum, that defendants not engage in a multi-million dollar fraud upon its clients." Plaintiffs further argue that the contracts "included an obligation to transmit money owed to [the funds]," and that defendants had a contractual obligation "not to keep any money for themselves unless they notified the [the funds] by accounting for those charges" (Opp. 23). These allegations are insufficient to state a claim for reverse false claims under the CFCA.

Plaintiffs cite *Bowen* for the proposition that pleading a contractual obligation is sufficient to state a claim under Section 12561(a)(7). But *Bowen* expressly stated that the obligation under a contract must have been sufficiently liquidated and certain to give rise to "actions of debt at common law for money or things owed." *State ex. rel. Bowen v. Bank of America Corp.*, 126 Cal. App. 4th 225, 242 (2005). Merely stating that defendants had a "preexisting duty to pay or transmit any monies owed to [the government funds]" does not give rise to an action in debt. Plaintiffs do not cite any provision of the contracts that characterize the FX spreads as "monies owed" in sum certain. Thus even if our intervenors' claims for breach of contract and fraud were to prevail, no CFCA reverse false claim has been properly alleged. Accordingly, defendants' motion to dismiss plaintiffs' claim under CFCA Section 12651(a)(7) is **GRANTED.**

### C.   Sections 12651(a)(2) and (3) Claims.

Plaintiffs allege defendants "used monthly reports, corresponding FX trade information, responses to requests, and their website to induce [the funds] to make payments which they should not have made." Pursuant to Section 12651(a)(2), liability under the CFCA is also assigned to any person who "knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." Both parties devote substantial argument

10

1  to the "materiality" requirement of Section 12651.  Because this order has found, however, that
2  no "claim" has been sufficiently alleged, there can be no liability under this subsection, which
3  plainly requires a nexus between the false record and a false or fraudulent "claim."
4        Similarly, Section 12651(a)(3) liability cannot attach in light of this order's findings.
5  Section 12651(a)(3) imposes liability on any person who "conspires to commit a violation of this
6  subdivision."  This order finds that the complaint fails to allege with specificity any violation
7  of Section 12651.
8        The parties dispute which version of the CFCA applies to the present action.  Plaintiffs
9  assert that the post-2009 amendment version, which added "or fraudulent" to the types of claims
10 covered under the act, is the applicable version.  The 2009 amendment did not affect the Section
11 12650 definition of a "claim," or the requirement that a "claim" be presented.  Because this order
12 finds that plaintiffs have failed to allege presentment of any "claim" by defendants, the
13 applicable language as to claim *type* need not be reached.  Accordingly, defendants' motion to
14 dismiss plaintiffs' claims under CFCA Sections 12651(a)(2) and (3) is **GRANTED.**
15       **3.**    **INTERVENORS' CLAIMS.**
16           **A.**    **Breach of Contract.**
17       To state a claim for breach of contract, a plaintiff must plead sufficient facts to
18 establish:  (1) the existence of a contract; (2) the plaintiff's performance under the contract;
19 (3) that the defendant breached the contract; and (4) the breach resulted in damage to the
20 plaintiff.  *Walsh v. W. Valley Mission Cmty. Coll. Dist.*, 66 Cal. App. 4th 1532, 1545 (1998).
21       Intervenors have sufficiently pled breach of contract.  The parties do not dispute the
22 existence of contractual custodial agreements.  Intervenors allege those contracts included the
23 obligation that defendants use "best execution," provide them with "competitive prices," would
24 "net FX trades," and "generally act for the benefit of its custodial clients" (Third Amd. Compl.
25 ¶¶ 27–60, 119–120, 133).  Intervenors allege they performed all or substantially all of the duties
26 imposed on them by the contracts, that defendants breached the contracts by selecting fictitious
27 FX rates to report and charge the government funds for standing instructions trades and failing
28

1  to offer plaintiff terms that were not less favorable than terms offered in comparable arm's length
2  transactions. Intervenors allege damage resulting from fraudulently inflated rates.

3  Defendants argue that "no contract contained a promise to buy and sell foreign currencies
4  to and from the funds at 'actual cost' or at the rates [defendants] obtained on the interbank
5  market." Defendants note that the FX Procedures provided to the government funds disclosed
6  that trades were executed by defendants acting "on a principal basis." With respect to at least
7  some of the funds, defendants argue that its contracts "expressly provided that [defendants]
8  would execute FX transactions as a principal and was permitted to retain profits" (Br. 23–24).

9  This order withholds judgment on the meaning of "principal basis" and the scope of
10 defendants' contractual obligations as defined by the several documents governing the parties'
11 relationship. Construction of the relevant contract provisions is not appropriate on a motion
12 to dismiss, before reasonable opportunity for discovery. Whether or not intervenors' claims are
13 legally sufficient to *prevail* is not at issue here. Thus, defendants' motion to dismiss intervenors'
14 claim for breach of contract is **DENIED**.

### B. Breach of Fiduciary Duty.

16 Defendants move to dismiss intervenors' breach of fiduciary duty claim because they
17 assert that no such duty existed with respect to the standing-instruction trades. A fiduciary duty
18 is undertaken by agreement when one party enters into a "confidential relationship" with
19 another. *See GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs.*, 83 Cal. App. 4th 409,
20 416 (2000). "The key factor in the existence of a fiduciary relationship lies in control by a
21 person over the property of another." *Vai v. Bank of America*, 56 Cal. 2d 329, 338 (1961).

22 The complaint alleges defendants owed a fiduciary duty to "act with the utmost good
23 faith in the best interests" of the funds. The complaint further alleges that defendants' conduct
24 in executing FX transactions constituted a breach of this fiduciary duty, and that this breach
25 was a substantial factor in causing intervenors' harm (Third Amd. Compl. ¶¶ 188–195).
26 Intervenors cite representations made in defendants' proposals as well as in the custodial
27 agreements and on their website to support the existence of a fiduciary responsibility (*id*. at
28 ¶¶ 37–38).

Defendants do not dispute that they exercised control over intervenors' property pursuant to their agreements. Defendants argue that their duties were limited, however, to "preserve, control and safekeep" fund assets, and that these duties did not give rise to a fiduciary relationship (Br. 30). Defendants further argue that, even in those instances where the custodial agreements referred to fiduciary duties, those agreements "made clear that [defendants] assumed no duty outside of those set forth by the contracts." FX execution, according to defendants, fell outside the purview of any fiduciary arrangement.

Defendants' arguments fail on a motion to dismiss, where the parameters of its fiduciary responsibilities under the several agreements is not properly reviewed. Intervenors have sufficiently alleged the several agreements imposed a fiduciary capacity on defendants, and that this duty was breached by defendants' markup strategy. Accordingly, defendants' motion to dismiss intervenors' claim for breach of fiduciary duty is **DENIED**.

### C. Fraud by Concealment.

Claims based in fraud are required to be pleaded with specificity in accordance with FRCP 9(b). To establish fraud, a plaintiff must show "(a) misrepresentation by concealment or non-disclosure; (b) knowledge of falsity (or scienter); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Small v. Fritz Cos., Inc.*, 30 Cal.4th 167, 173 (2003). Concealment also requires that "the defendant must have been under a duty to disclose some fact to the plaintiff." *Hahn v. Mirda*, 147 Cal. App. 4th 740, 745 (2007).

Accepting allegations in the complaint as true, intervenors have sufficiently pleaded a claim for fraud by concealment. The complaint alleges defendants knowingly misled the funds in describing the FX trading programs in their proposals, on their website, and in the respective agreements with custodial clients. Defendants' representations that transactions would be priced within a "range of the day" caused the funds to believe they would not receive the worst possible rate within that range for each day.

Intervenors further allege that defendants were aware of and actively sought to conceal this scheme. An internal email from 2008, as cited in the complaint, allegedly stated that the FX standing-instruction was the "most profitable" business for defendants based on a "lack of

full transparency." That email allegedly also stated that a "fair return" on negotiated (not standing-instruction) deals is only a fraction of that expected from standing-instruction arrangements. The complaint also alleges that a 2009 internal email argued against disclosing price spreads because it would devastate the bank's profits (Third Amd. Compl. ¶¶ 86–102).

Defendants argue that where, as here "a trader in foreign currencies is not a fiduciary, California law does not prohibit it from earning a profit off of an FX spread and does not require it to disclose that FX spread to its customers." Defendants err in relying on *Lucky Money, Inc.*, which held that no duty to disclose attached to an arms-length foreign exchange transaction. *McCann v. Lucky Money, Inc.*, 129 Cal. App. 4th 1382, 1387 (2005). Intervenors do not allege that defendants were engaged in arms-length transactions, but were rather bound by their own agreements and representations to provide the funds with disclosures.

Defendants also argue that the complaint fails to allege any "non-conclusory facts that, taken as true, would show that [intervenors] reasonably relied on [defendants'] alleged omissions" (Opp. 31). Because the funds only learned of the trades after-the-fact, defendants argue they could not have relied on the assigned prices in deciding whether to enter into those transactions. This argument fails. The complaint does not allege the funds relied only on the monthly statements in deciding whether to enter into the trades. Rather, plaintiffs contend they relied on defendants' ongoing misrepresentations in selecting them as custodian as well as choosing the FX standing-instruction service.

Contrary to defendants' assertion, the funds' alleged reliance is not unreasonable as a matter of law. The mere fact that the interbank rates are published and available does not render reliance unreasonable where other pertinent information, *i.e.*, the times of the trades in question, was withheld. Intervenors allege that defendants withheld the times of trades on monthly statements for the very purpose of obfuscating the true values. Defendants cannot seek to hide behind their own lack of transparency.

Because intervenors sufficiently allege a claim for fraud by concealment, defendants' motion as to this claim is **DENIED.**

### D. California Business and Professions Code Section 17200.

Under Section 17200, the plaintiff must assert an "unlawful, unfair or fraudulent business act or practice." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Section 17200 establishes three alternative bases for finding illegal conduct: (1) unlawful; (2) unfair and deceptive; or (3) fraudulent. Since Section 17200 is written in the disjunctive, a plaintiff need allege only one of the three theories to properly plead a claim.

Although the complaint fails to state a claim under the CFCA, intervenors have adequately pleaded a claim under Section 17200. Intervenors allege that defendants intentionally made misleading representations about the nature of their services, and that the funds reasonably relied on such representations in selecting defendants' products and services. Based on the complaint, this order has already found intervenors have specifically alleged all required elements of fraud by concealment or non-disclosure.

Defendants argue that the fraudulent practices claim must fail because: (1) their representations were not misleading as a matter of law; (2) they were not under any obligation to disclose any further information to the funds; and (3) the complaint never alleges any employee or agent of the funds actually read defendants' website (Opp. 32). Defendants' first and second arguments have already been addressed by this order. While defendants correctly state that reliance is an element of a claim for fraud, intervenors have pleaded reliance on defendants' misrepresentations. The funds' choice to employ defendants' custodial and FX standing-instruction services was allegedly based on a series of misrepresentations intended to induce precisely that.

Accordingly, defendants' motion to dismiss intervenors' claim under Section 17200 of the Business and Professions Code is **DENIED**.

### E. Unjust Enrichment.

Defendants argue that there exists no separate action for unjust enrichment in California. This order agrees. Unjust enrichment is "not a cause of action . . . or even a remedy, but rather a general principle, underlying various legal doctrines and remedies. It is synonymous with restitution." *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004). As such, a claim

15

for unjust enrichment is properly pled as a claim for a contract implied-in-law. It "does not lie when an enforceable, binding agreement exists defining the rights of the parties." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996). California, however, recognizes an exception to the rule that unjust enrichment does not lie when an enforceable contract exists: "Restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason." *McBride*, 123 Cal. App. 4th at 388.

Intervenors have not alleged that the parties' rights were not squarely set out in a binding agreement, or that the express contracts were ineffective. The complaint alleges only that defendants "have in their possession money which in fairness ought to be paid" to the funds. This allegation fails to state a claim for unjust enrichment. Defendants' motion to dismiss intervenors' unjust enrichment claim is accordingly **GRANTED.**

**4. FORUM-SELECTION CLAUSES.**

Defendants move to dismiss claims five through nine (non-CFCA claims) by intervenors LACERA, SDCERA and SCERA pursuant to 12(b)(3) for improper venue. In support of their motion, defendants append copies of the custody agreements with these three entities, which defendants allege contain forum-selection clauses (Los Angeles, Stanislaus, and San Diego Counties, respectively). At the Court's direction, both parties have submitted supplemental briefing on the question of enforcement of these provisions.

The relevant clauses in these agreements are as follows:

> 1. LACERA: "Should either party file a lawsuit over any matter arising out of this Agreement, such lawsuit shall be filed in the County of Los Angeles, State of California."
>
> 2. SCERA: "This Agreement shall be interpreted and construed in accordance with the laws of the state of California, with venue in Stanislaus County."
>
> 3. SDCERA: "Venue for any action arising from this Agreement shall lie exclusively in the State and Federal courts located in San Diego County."

(Dkt. No. 32, Exhs. 1, 5, 9). These clauses are properly considered in the context of a motion to dismiss. *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 324 (9th Cir. 1996).

16

Intervenors are correct that these clauses refer to venue, and not forum, and as such would likely be deemed void under California precedent which disfavors contractual venue selection. Contrary to intervenors' contention, however, California law does not govern the question of venue here, though the contracts alleged are governed thereunder.

The immediate question presented is not whether the provisions can be enforced, but the applicability of FRCP 12(b)(3) to defendants' request to give effect to these provisions. *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). Our court of appeals has held that FRCP 12(b)(3), which is approved by Congress, directs federal courts in deciding questions of venue, even where a contract is governed by state law. Federal law also applies to interpretation of these clauses. *Manetti-Farrow, Inc. v. Gucci America, Inc*., 858 F.2d 509, 513 (9th Cir. 1988).

Courts in this circuit refer to similar contractual language as forum-selection clauses, even where venue is specified. Under federal law, forum-selection clauses are presumptively valid and should not be set aside unless the party challenging enforcement of such a provision can show it is unreasonable under the circumstances. *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10 (1972). Both the Supreme Court and our court of appeals have construed the "unreasonable" exception narrowly. A forum-selection clause is unreasonable if: (1) the inclusion of the clause in the agreement was the product of fraud or overreaching; (2) the party wishing to repudiate the clause would effectively be deprived of his day in court were the clause enforced; and (3) enforcement would contravene a strong public policy of the forum in which suit is brought. *Murphy v. Schneider Nat'l, Inc*., 362 F.3d 1133, 1140 (9th Cir. 2004).

Intervenors argue that, because this action was commenced by relator FX Analytics, and not the individual funds, the contractual forum-selection clauses do not apply. This order disagrees. While relator indeed filed this action in California superior court, it did so "in the name of the political subdivision, if political subdivision funds are exclusively involved," as provided by Section 16252. The relator is "effectively assign[ed] the government's claims" and thus "stands in the shoes of the government." *United States ex. rel. Kelly v. Boeing Co.*, 9 F.3d

17

743, 748 (9th Cir. 1993).  Even if the LACERA provision was limited to the *commencement* of a lawsuit, this suit was commenced on behalf of the several funds, including LACERA.

The forum-selection clauses in this action do not meet the strict criteria for finding exception to the contracted forums.  Intervenors are sophisticated business entities.  Inclusion of the forum-selection provisions was not the product of fraud — the provisions favor the convenience of the funds, not defendants, as the funds are located in each of the respective counties.  Intervenors do not argue that litigation in Stanislaus, Los Angeles, and San Diego would effectively deprive them of their day in court.  Nor do intervenors point to any public policy of this forum which would outweigh the presumptive validity of these clauses over their non-CFCA claims.

While defendants' Rule 12(b)(3) argument appears limited to the intervenors' non-CFCA claims, this order also concludes that the CFCA nevertheless fails to provide a basis to set aside the forum-selection clauses.  Intervenors' best argument is that the venue provisions of the FCA, from which the CFCA is drafted, "are to be construed to make *qui tam* litigation more efficient and to avoid multi-jurisdictional filings" (Opp. 2).  Intervenors cite U.S. Senate Report No. 99-345, which modernized the jurisdiction and venue provision of the FCA.  That report stated that the old law, which required suit to be commenced in the district where the defendant could be found, "hinder[ed] the Government's litigative effort in cases involving multiple defendants," by:

> [F]orc[ing] the Department of Justice to file multiple suits involving the same scheme or pattern or fraudulent conduct against each defendant in the district in which he or she may be found at the time suit is commenced. Multiple suits, of course, increase the cost to the Government to pursue these cases and have a comparable impact upon the judicial resources required for a complete adjudication.

S. Rep. No. 99-345, 99th Congr., 2d Sess. 32, 1986 U.S.C.C.A.N. 5266, 5297.  This statement does not address a strong public policy concern specific to this forum, as required under the third prong of our court of appeals' analysis.  Nor does it address the situation at hand — we are not here faced with multiple or elusive defendants, but multiple intervenors who have contractually agreed to litigate in a given location.  While this order recognizes that judicial economy will not

be best served by enforcing these forum-selection clauses, intervenors have not met the heavy burden of showing a strong public policy in this forum to outweigh the presumptively valid contractual provisions. Accordingly, LACERA, SDCERA and SCERA must be bound to litigate in the locations specified within their respective contracts. While the Court recognizes its discretion to either transfer or dismiss pursuant to FRCP 12(b)(3), it finds that dismissal is here the more appropriate solution. Accordingly, all claims by LACERA, SDCERA and SCERA are **DISMISSED WITHOUT PREJUDICE** to the refiling of these claims in the appropriate venues.

**5.    MANDATORY DISPUTE RESOLUTION.**

Because this order finds that LACERA's claims are not properly before it, the merits of defendants' additional argument that LACERA failed to engage in contractually obligated dispute resolution cannot be addressed.

**6.    PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE.**

Plaintiffs request that judicial notice be taken of four items: (1) a copy of the complaint filed in *United States of America v. The Bank of New York Mellon Corporation*, No. 11-CV-6969 (S.D.N.Y. Oct. 4, 2011) (Dkt. No. 1); (2) a copy of the "Stipulation and Order of Partial Settlement and Dismissal," *United States of America v. The Bank of New York Mellon Corporation*, No. 11-CV-6969 (S.D.N.Y. Oct. 4, 2011) (Dkt. No. 1); (3) a copy of the "Minute Order of a Hearing on Demurrer," *State of California ex. rel. Associates Against FX Insider Trading v. State Street Corp.*, No. 34-2008-00008457-CU-MC-GDS (Mar. 30, 2010); and (4) a copy of a publication entitled "Resetting the Roadmap: Managing in a New Securities Lending Environment for Beneficial Asset Holders" by the Bank of New York Mellon (RJN 3). Because this order need not rely on these documents, plaintiffs' request for judicial notice is **DENIED AS MOOT.**

**7.    PLAINTIFFS' EVIDENTIARY OBJECTIONS.**

Plaintiffs object to the admissibility of all materials submitted with defendants' Gregory G. Rapawy Declaration on the ground that Mr. Rapawy lacks personal knowledge of the documents. Intervenors cite to the LACERA, SCERA, and SDCERA custody agreements in their supplemental brief (Dkt. No. 67 at 1), and do not contest the existence or language of the

19

forum-selection provisions contained therein. Because the contract language relied upon by this order is undisputed, it need not determine the admissibility of Rapawy Exhibits 1, 5, and 9 which contain the forum-selection clauses of these custody agreements. This order does not rely on any other documents appended to the Rapawy Declaration. Accordingly, plaintiffs' evidentiary objections are **DENIED AS MOOT.**

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs may seek leave to amend the complaint and will have **TWENTY-ONE CALENDAR DAYS** from the date of this order to file a motion, noticed on the normal 35–day track, for leave to file an amended complaint. Plaintiffs must append to their motion a proposed amended complaint that clearly explains how the amendments cure the defects identified herein. In addition, all claims by LACERA, SDCERA and SCERA are **DISMISSED WITHOUT PREJUDICE** to the refiling of these claims in the appropriate venues. Plaintiffs' request for judicial notice and plaintiff's evidentiary objections are **DENIED AS MOOT.**

**IT IS SO ORDERED.**

Dated: March 30, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE