UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

BANK OF NEW YORK MELLON CORP.
FOREX TRANSACTIONS LITIGATION

                                          MASTER DOCKET
                                          12 MD 2335 (LAK)

This document relates to:

*Los Angeles Cty. Emp. Ret. Ass'n ex rel. FX Analytics v.*
*The Bank of New York Mellon Corp.*, 12 Civ. 8990 (LAK)

*In re Bank of New York Mellon Corp. False Claims Act*
*Foreign Exch. Litig.*, 12 Civ. 3064 (LAK).
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

    Appearances:

                Steven N. Williams
                Adam J. Zapala
                Eric J. Buescher
                Gene W. Kim
                COTCHETT, PITRE & MCCARTHY LLP

                Carmen A. Trutanich
                Alan L. Manning
                Marie McTeague
                OFFICE OF THE LOS ANGELES CITY ATTORNEY

                *Attorneys for Plaintiffs Los Angeles Department of Water*
                *and Power Retirement Plan and Los Angeles County*
                *Employee Retirement Association*

                Richard H. Heimann
                Lexi J. Hazam
                Robert L. Lieff
                LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

Philip R. Michael
MICHAEL LAW GROUP

Michael P. Thornton
Michael A. Lesser
Evan R. Hoffman
THORNTON & NAUMES LLP

*Attorneys for Plaintiff/Relator*

Reid M. Figel
Rebecca A. Beynon
David L. Schwarz
Derek T. Ho
Gregory G. Rapawy
Joshua D. Branson
KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL,
P.L.L.C.

*Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

This is yet the next chapter in the litigation regarding the standing instruction foreign exchange ("FX") trading service provided by Bank of New York Mellon ("BNY Mellon")[1] to its custodial customers.  In *Southeast Pennsylvania Transportation Authority v. Bank of New York Mellon Corp.* ("*SEPTA*"),[2] this Court sustained a BNY Mellon customer's claim of breach of contract and, to a limited extent, its claim of breach of fiduciary duty.  In *United States v. Bank of New York Mellon* ("*DOJ*"),[3] it sustained in part the federal government's claims that BNY Mellon committed mail and wire fraud and is liable for civil penalties under Section 951a of the Financial

---

[1]

"BNY Mellon" refers collectively to Bank of New York Mellon and its various predecessors and affiliates.

[2]

921 F. Supp. 2d 56 (S.D.N.Y. 2013).

[3]

941 F. Supp. 2d 438 (S.D.N.Y. 2013).

2

Institutions Reform, Recovery and Enforcement Act of 1989, commonly known as FIRREA.[4]

Here, a relator brings claims on behalf of four California governmental entities against BNY Mellon, its affiliates, and unnamed individuals under the California False Claims Act ("CFCA").  Two of these entities have intervened to pursue their own claims.  The matters are before the Court on defendants' motions to dismiss the operative complaints.

*Background*

I.     *Procedural History*

Relator FX Analytics first filed a complaint against defendants under seal in Alameda County Superior Court in October 2009.  It asserted CFCA claims on behalf of a number of California governmental entities including, *inter alia*, Los Angeles County Retirement Association ("LACERA"), Los Angeles Department of Water & Power Employees' Retirement Plan ("LADWP"), the Santa Barbara County Employees' Retirement System Fund ("SBCERS"), and the Tulare County Employees' Retirement Association Fund ("TCERS").[5]  LACERA, LADWP, and other entities not relevant here subsequently intervened in the action and asserted claims under the CFCA, the California Business and Professions Code, and the common law.  In November 2011, defendants removed the case to the United States District Court for the Northern District of California  and later moved to dismiss.

In March 2012, the California district court held that none of the CFCA claims

---

[4]

     12 U.S.C. § 1833a.

[5]

     The complaint included several other entities who are no longer part of the case and need not be discussed further here.  *See In re Bank of N.Y. Mellon Corp. False Claims Act Foreign Exch. Litig.*  ("*In re BNYM*"), 851 F. Supp. 2d 1190, 1193 (N.D. Cal. 2012).

stated a legally sufficient claim, upheld the legal sufficiency of all of the non-CFCA claims except that for unjust enrichment, and held that the venue was improper as to LACERA's complaint in consequence of a forum selection clause in the relevant custody agreement.[6]  The court permitted plaintiffs to seek leave to amend and ruled that the dismissal of LACERA's claims was without prejudice to their being re-filed in the proper venue.  In April 2012, the case was transferred to this Court by the Judicial Panel on Multidistrict Litigation ("JPML").  Both relator and LADWP eventually filed Fourth Amended Complaints. Defendants moved to dismiss both complaints in February 2013.

Meanwhile, pursuant to the March 2012 opinion, LACERA re-filed its claims in a new complaint in the Central District of California in September 2012.  That case too was transferred to this Court by the JPML, and defendants moved to dismiss in December 2012.

Following filing of the motions to dismiss in December 2012, both LACERA and LADWP filed amended complaints, LACERA's first and LADWP's fifth.  As previously indicated, the Court treats the December 2012 motions as being addressed to the subsequent amended complaints in the interest of judicial economy.

## II.    Factual Background

LACERA, LADWP, SBCERS, and TCERS each had a custodial agreement with BNY Mellon[7] whereby BNY Mellon agreed to hold various assets, including cash and securities,

---

[6]

      *See generally id.*

[7]

      LADWP and SBCERS entered into these arrangements in 2004, TCERS in 2003, and LACERA in 1994. *See* Relator Cpt [DI 119, Ex. A] ¶ 124; LADWP Cpt [DI 257, Ex. A] ¶ 123; LACERA Cpt [DI 259, Ex. A] ¶ 122.

4

on each's behalf.  BNY Mellon expressly acknowledged in its agreements with LADWP and LACERA that it had assumed fiduciary obligations, at least in certain respects.[8]

As part of their custodial relationships, each customer regularly received monthly invoices for payment in accordance with a particular fee schedule.[9]  The fee schedules varied by client.[10]  In each case, however, the fee schedule specified that the client was responsible for certain "custodial fees"—fees that were fixed or that varied with the value of the assets BNY Mellon held on the client's behalf.[11]  Moreover, the fee schedule in each case specified certain "transaction fees"—fees that were tied to individual transactions conducted by the client with respect to its assets in BNY Mellon custody.[12]

From time to time, the clients wished to engage in FX trading, *e.g.*, to convert foreign currency dividends into U.S. dollars.  Each used BNY Mellon's standing instruction service to do so.  The Court assumes familiarity with its prior opinions that lay out the details of this program.[13]  As the Court recently summarized,

---

[8]

      *See* LADWP Branson Decl. [DI 215], Ex. 1 at 9; LACERA Branson Decl. [DI 169], Ex. 1 at 6.

[9]

      LACERA Cpt ¶ 132; LADWP Cpt ¶ 128; Relator Cpt ¶¶ 126-27.

[10]

      Moreover, the fee schedule for each client appears to have been subject to amendment over time.  *See, e.g.*, Ex. 6, 7, Branson Decl. (depicting revisions in LACERA's fee schedule).

[11]

      *See, e.g.*, LACERA Branson Decl., Ex. 6.  For brevity and convenience, the Court will at times omit parallel citations relating to each fund.  Except where otherwise indicated, the funds' pleadings are consistent with each other.

[12]

      *See, e.g.*, *id.*

[13]

      *See DOJ*, 941 F. Supp. 2d at 444-49; *SEPTA*, 921 F. Supp. 2d at 62–70.

"In standing instruction ('SI') trading, BNY Mellon automatically converted its customers' funds from one currency to another as such needs arose, informing the customer of the executed price only after the fact. It described the service, among other things, as providing 'best execution.' Plaintiffs in this and other actions have alleged, however, that this term had an industry meaning inconsistent with the Bank's actual pricing practices. These practices, which were not disclosed to customers, were to price the trades at or near the least favorable interbank market rate of a given trading day. SI trading was highly profitable for BNY Mellon . . . as its margins well exceeded those of directly negotiated FX transactions."[14]

LACERA and LADWP allege that they or their investment managers signed certain FX procedure forms relating to the program.[15] One hyperlink on this form went to an FX policies and procedures document, and another went to the Standing Instructions Page, which contained the representation that the program provided best execution. These items are discussed in more detail in *SEPTA*.[16]

Each client received monthly transaction statements relating to standing instruction transactions that indicated the prices at which their currencies had been converted during the prior month.[17] These statements contained no requests for action or payment by the client, as the client's account already had been debited or credited by BNY Mellon in accordance with the conversion rate relevant to the given trade.[18] But plaintiffs' contracts did afford them a fixed period in which they

---

[14]

*In re Bank of New York Mellon Corp. Forex Trans. Litig.*, 12 MD 2335 (LAK), 11 Civ. 8471 (LAK), 2013 WL 3358028 at *1 (S.D.N.Y. July 2, 2013) (footnotes omitted). The allegations of the instant complaints are consistent with this summary.

[15]

LACERA Cpt ¶¶ 158–64; LADWP Cpt ¶¶ 132–38.

[16]

921 F. Supp. 2d at 64–69.

[17]

*See, e.g.*, LACERA Cpt ¶ 195.

[18]

*See, e.g.*, *id.* ¶ 194.

6

could object to any transaction listed on the report.[19]

Aside from the FX conversion rates at which BNY Mellon executed the trades, certain clients allege that they paid separate and additional transaction fees for each standing instruction trade and that these transaction fees were billed on the custodial invoices discussed above.  In particular, LACERA alleges that it was charged a fee ranging from $12 to $75 for each standing instruction trade.[20]   Similarly, the relator alleges that SBCERS and TCERS paid "transaction fees for custodial standing instruction FX trades as well as 3rd party FX transactions."[21] LADWP alleges that BNY Mellon represented "that its Standing Instruction service was 'free of charge.'"[22]

*Discussion*

LADWP, LACERA, and relator (on behalf of TCERS and SBCERS) each brings claims under the CFCA.  LADWP and LACERA bring claims also of breach of contract, breach of fiduciary duty, fraud by concealment, and violation of California Business and Professional Code Section 17200.[23]

---

[19]

LACERA Cpt ¶ 196; LADWP Cpt ¶ 140; Relator Cpt ¶ 142.

[20]

LACERA Cpt ¶ 134.

[21]

Relator Cpt ¶¶ 127, 130.

[22]

LADWP Cpt ¶ 182.

[23]

The California district court (Alsup, J.) denied defendants' motion to dismiss as to LADWP's non-CFCA claims, except that for unjust enrichment, but its decision ultimately dismissed LACERA's claims on venue grounds.

I.      *Breach of Contract*

LACERA and LADWP contend that defendants are liable for breach of contract on a number of grounds, including their alleged failures to (1) provide best execution, (2) net trades, (3) keep proper records, (4) provide competitive rates, (5) exercise reasonable care in the execution of duties, and (6) disclose the standing instruction pricing scheme.[24]

The Court denies defendants' motions insofar as plaintiffs advance the theory of breach of contract this Court sustained in *SEPTA*—that FX procedure forms relating to standing instruction incorporated a contractual best execution obligation that defendants allegedly failed to meet.[25]  The Court, however, grants the motion as to all other theories of breach of contract.

Plaintiffs allege that defendants have breached a contractual obligation to net their trades based on a representation on defendants' website that they would aggregate and net trades "based on guidelines tailored to client needs."[26]  Defendants contend that this representation did not promise netting but simply made it available to clients who negotiated customized netting

---

"[T]raditional principles of law of the case counsel against the transferee court reevaluating the rulings of the transferor court."  *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991).  Nevertheless, the law of the case goes to the transferee court's discretion, not its power.  *Id.*  The plaintiffs' non-CFCA claims are closely interrelated with the amended CFCA claims that Judge Alsup did not consider and that now are before this Court.  In the circumstances of this case, the Court reluctantly exercises its discretion to consider defendants' motion to dismiss LADWP's non-CFCA claims *de novo* notwithstanding the traditional rule.

[24]

See, e.g.*, LACERA Cpt ¶¶ 222–23.

[25]

*SEPTA*, 921 F. Supp. 2d at 70–78.  Defendants effectively concede that the recent amendments by LACERA and LADWP adequately allege the breach of contract theory sustained in *SEPTA*.  DI 263.

[26]

See, e.g.*, LACERA Cpt ¶ 56 (emphasis omitted); *see also DOJ*, 941 F. Supp. 2d at 446 (explaining the concept of netting and BNY Mellon's alleged representations).

8

arrangements.  But, as this Court observed in *DOJ*, that understanding of the statement cannot be determined as a matter of law at this stage.[27]  Nevertheless, the complaints fail to allege that this representation on the website formed part of a contract among the parties.  This theory therefore is dismissed.

Plaintiffs allege also that the contracts obliged defendants "to provide extremely competitive market driven rates" and that defendants asserted that the competitiveness of their rates was ensured through a report showing rates falling outside of the daily range.[28]  This theory too fails.

The Court has accepted the sufficiency of plaintiffs' "best execution" theory because plaintiffs plausibly have alleged that the term has an industry meaning inconsistent with defendants' pricing practices.[29]  Plaintiffs allege nothing comparable with regard to "competitive rates." Plaintiffs do not allege that BNY Mellon's pricing was uncompetitive in the universe of similar standing instruction products.  Moreover, the Court questions whether defendants' alleged pledge to "strive[]" to provide competitive rates could be an enforceable contractual promise.[30]

Nor may plaintiffs proceed on a theory that defendants' pricing breached a contractual standard of reasonable care.  To be sure, plaintiffs allege that defendants assumed a contractual duty to discharge their duties "with the competence, care, skill, prudence, and diligence

---

[27]  *Id.* at 478-79.

[28]  LACERA Cpt ¶ 123.  The "daily range" appears to refer to the range between the lowest and highest interbank rates that the currency traded that day.

[29]  *SEPTA*, 921 F. Supp. 2d at 76–77; *DOJ*, 941 F. Supp. 2d at 465-67.

[30]  *See Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 209 (2006) ("To be enforceable, a promise must be definite enough that a court can determine the scope of the duty, and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." (internal quotation marks and alterations omitted)).

9

prevailing in the custodial industry."[31]  But, as defendants point out, this is a duty of skill, distinct from a duty of loyalty.[32]  Plaintiffs do not allege any facts suggestive of any failure on defendants' part to perform in a skillful, careful, or diligent manner.

Plaintiffs assert also a breach of the implied covenant of good faith and fair dealing. But as the Court explained in *SEPTA,* that contention is inapposite in this context.[33]

## II.    *Breach of Fiduciary Duty*

LACERA and LADWP allege that their custodial contracts created a fiduciary relationship and that defendants breached their fiduciary duties.  The Court considers the two alleged breaches of breach of fiduciary duty they advance.

### A.    *Fiduciary Obligation to Provide Best Prices*

First, SEPTA alleged that BNY Mellon was acting in a fiduciary capacity when executing standing instruction trades.  It contended that the bank therefore had a freestanding obligation to provide the best pricing it could, independent of any best execution covenant or representation.  This Court disagreed, concluding that SEPTA's complaint in substance alleged that BNY Mellon acted as principal, not as a fiduciary, when executing standing instruction trades for SEPTA.

---

[31]  *See, e.g.*, LACERA Cpt ¶ 28.

[32]  *See Michel v. Palos Verdes Network Group, Inc.*, 156 Cal. App. 4th 756, 762 (2007) (distinguishing concepts).

[33]  921 F. Supp. 2d at 78–80.  Plaintiffs point to no California law to the contrary.

LADWP's complaint alleges little to warrant a different conclusion. It quotes a part of its custodial contract indicating that BNY Mellon "acknowledge[d] that it is a Plan fiduciary *with respect to the duties undertaken pursuant to this Agreement*."[34] It alleges that BNY Mellon represented during the request for proposal ("RFP") process that, as custodian, it would have "a fiduciary responsibility to ensure that all of your assets are properly held in safekeeping and that all assets are accurately reported on our accounting system."[35] The RFP response, which allegedly was incorporated into the contract, said also that BNY Mellon was "able to . . . provide foreign exchange services" and explained those services in greater detail.[36] But these allegations are insufficient. An obligation to keep safe and report assets accurately does not give rise to a best pricing obligation. Moreover, the complaint's allegation that FX trading was provided as a "service" did not make it one of its BNY Mellon's "duties" as custodian of LADWP's assets under the custodial agreement.

LACERA's complaint is similarly deficient. It alleges that the contract defined "Custodian" as BNY Mellon "in its fiduciary capacity as the entity which is obligated to preserve, control and safekeep any Property" entrusted to it by LACERA.[37] It further alleges that BNY Mellon "acknowledge[d]" in the contract "that this Agreement place[d] it in a fiduciary relationship with LACERA."[38] It alleges that BNY Mellon "agree[d] to provide the custodial, accounting, and

---

[34] LADWP Cpt ¶ 27 (emphasis added).

[35] *Id.* ¶ 124(a).

[36] *Id.* ¶¶ 123, 124(b).

[37] LACERA Cpt ¶ 28(b).

[38] *Id.* ¶ 28(c).

reporting services" to LACERA outlined in a document called the "Statement of Work."[39]  It then quotes from a portion of the Statement of Work that obligated BNY Mellon to "make payment of funds . . . for the purchase or sale or [sic] foreign exchange of foreign exchange contracts for the Account, including transactions executed with or through [BNY Mellon] or its Agents."[40]  But these allegations also fail.  That BNY Mellon was obligated to make payments to facilitate trading did not give rise to a fiduciary obligation to provide the best possible trading prices.

Perhaps recognizing these deficiencies, plaintiffs rely almost entirely on supposed contractual language that appears nowhere within the four corners of the complaints.  LADWP relies on language said to obligate BNY Mellon to "[t]ake actions necessary to settle transactions in . . . foreign exchange or foreign exchange contracts."[41]  LACERA relies on quotations from BNY Mellon's RFP response (which it alleges also was incorporated into the contract) and a document entitled "A Guide to Trading Around the World," which allegedly was an appendix to the "Statement of Work" of the original contract.[42]

While the Court has discretion to consider language from documents such as these – the documents plainly are relied on by plaintiffs and are integral to the complaint – it declines to do so.[43]  It is plaintiffs' responsibility to allege facts sufficient to make out plausible claims for

---

[39]    *Id.* ¶ 129(a).

[40]    *Id.* ¶ 129(b)-(c).

[41]    LADWP Branson Decl., Ex. 1 § 6(c).

[42]    LACERA Opp. [DI 170] at 4–5; *see* LACERA Branson Decl., Ex. 1 at A-3.

[43]    *Matson v. Bd. of Education of City Sch. Dist. of N.Y.*, 631 F.3d 57, 62 (2d Cir. 2011) ("On a motion to dismiss, the court *may* consider any written instrument attached to the complaint

relief.  Plaintiffs did not quote this language in or attach the documents said to contain it to the complaints.  This failure resulted in scattershot and undeveloped briefing, as defendants did not have notice of these factual allegations underlying plaintiffs' claim.  This problem is particularly acute with respect to "A Guide to Trading Around the World," as LACERA and defendants each argue about what version of the document allegedly was incorporated into the contract and when.

Thus, plaintiffs' breach of fiduciary duty claim, insofar as it is premised on an alleged freestanding fiduciary obligation of BNY Mellon to provide the best possible pricing, is dismissed.

B.    *Alleged Misrepresentations and Nondisclosure*

Despite dismissing the claim that BNY Mellon acted in a fiduciary capacity while executing SEPTA's standing instruction trades, the Court permitted SEPTA to pursue a claim for breach of fiduciary duty based on assertions that BNY Mellon misleadingly described the program as providing "best execution"[44] and failed adequately to disclose "whether the standing instruction service was part of BNY Mellon's fiduciary responsibilities."[45]  Plaintiffs have indicated that they

---

as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." (alterations omitted and emphasis added)).

Of course, even if the Court were to consider the language LADWP quotes, LADWP would have to address *SEPTA*'s conclusion that it would be "quite a leap" to go from a fiduciary *settlement* obligation to a fiduciary *execution* obligation.  921 F. Supp. 2d at 82–83.

[44]

921 F. Supp. 2d at 87.  The Court permitted such a claim in the alternative to the claim that best execution was a contractual obligation.

[45]

At least one court has reached the same result following *SEPTA*.  *See People ex rel. Schneiderman v. Bank of New York Mellon Corp.*, No. 114735/09, 2013 WL 4516209, at *22 (N.Y. Sup. Ct. Aug. 5, 2013) (concluding that "a similar claim is potentially viable" under New York law and citing several cases).

13

seek to advance the same theory.

Defendants have not provided a reason to rule differently here. They do not argue that LADWP or LACERA's contracts warrant a different conclusion—as in *SEPTA*, the Court concludes that standing instruction was closely related to BNY Mellon's undisputed fiduciary duties, triggering a need for BNY Mellon not to mislead its clients when it sought further profit from the relationship. Defendants allude briefly to the fact that *SEPTA* was decided as a matter of Pennsylvania law, whereas California law governs the present case.[46] But they point to no California law inconsistent with the basic principles on which *SEPTA* relied – that "where a fiduciary seeks to profit by acting in a principal capacity in matters sufficiently related to the subject of its fiduciary duties, the fiduciary may do so only if, at a minimum, it fully and fairly discloses the nature of the relationship and its duties."[47]

Indeed, if anything, California appears to recognize the same basic principles that supported SEPTA's position under Pennsylvania law. In *Van de Kamp v. Bank of America*,[48] the California Court of Appeal concluded that a custodial bank's handling of cash proceeds after a sale of securities did not violate any fiduciary obligations. It reasoned that "[t]he bank's duty as agent is limited to the scope of the agency set forth in the parties' agreement" and the agreement indicated

---

[46]

Status Report [DI 234] at 37.

[47]

*SEPTA*, 921 F. Supp. 2d at 86. In their motion to dismiss LADWP's complaint, defendants cite *Petersen v. Secs. Settlement Corp.*, 226 Cal. App. 3d 1445, 1456 (1991), and *Brown v. California Pension Adm'rs & Consultants, Inc.*, 45 Cal. App. 4th 333, 348 (1996). But those cases stands only for the uncontroversial principle that fiduciaries performing ministerial functions have no obligation to advise against imprudent investments. They do not say that such fiduciaries may seek to profit as principals after providing misleading disclosures about a program closely connected to their fiduciary obligations.

[48]

204 Cal. App. 3d 819 (1988).

that the agency terminated upon the sale of securities.[49]  At the same time, the court went on to state: "The question remains, however, whether defendant breached any *duty of disclosure* owed to the principals of the custodial agency accounts.  As previously discussed, the agent must disclose whether it acts on its own account or adversely to the principal in a transaction connected with its agency."[50]  Thus, the court recognized that an agent may have a duty of disclosure with regard to matters "connected with its agency" even when the agency relationship does not formally govern the transaction in question.[51]  Other California authorities confirm the point.[52]

The Court cannot conclude  as a matter of law that the duty of disclosure has been satisfied here.[53]  The motion therefore is denied as to claims of breach of fiduciary duty based on

---

[49]

*Id.* at 860-61.

[50]

*Id.* at 861 (emphasis added).

[51]

The court ultimately concluded that no such disclosure was required because the transaction occurred only after termination of the agency relationship and thus was not "connected with its agency."  But that is not this case.

[52]

*See also Twomey v. Mitchum, Jones & Templeton, Inc.*, 262 Cal. App. 2d 690, 715 (1968) ("The fact that defendants made more in trading as principal and that they did so trade with the plaintiff, without full disclosure, tends to show an indifference to the fiduciary duty owed to a client whose funds they controlled."); *Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1338 (2012) (noting that fiduciary "can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent"); *Jorgenson v. Beach 'N' Bay Realty, Inc.*, 125 Cal. App. 3d 155, 162 (1981) ("[W]hen the acts of an agent have been questioned by his principal and the fiduciary relationship has been established, the burden is cast upon the agent to prove that he acted with the utmost good faith toward his principal and that he ma[d]e a full disclosure prior to the transaction of all the facts relating to the transaction under attack." (internal quotation marks omitted)).

[53]

In *SEPTA*, this Court concluded that the "mere reference to 'principal basis' in a document incorporated by" an FX procedure form did not foreclose a plausible claim that the disclosures were insufficient.  921 F. Supp. 2d at 87.  SEPTA specifically had not disputed that the document containing the "principal basis" disclosure governed its trades.  *Id.* at 83.  In this case, plaintiffs allege that "[a]t some point" their investment managers were required

alleged misrepresentations and nondisclosures.


III.    CFCA

        LACERA, LADWP, and relator (on behalf of TCERS and SBCERS) bring several

claims under the CFCA, which generally proscribes, among other things, the submission of false

claims for money, property, or services, to the government.  It has been designed "to prevent fraud

on the public treasury"[54] and "should be given the broadest possible construction consistent with that

purpose."[55]   As it "is patterned on similar federal legislation [the federal False Claims Act

("FCA")][, . . . ] it is appropriate to look to precedent construing the equivalent federal act."[56]


        A.      The Relevant Version of the CFCA

        As an initial matter, it is necessary to determine which of two versions of the CFCA

applies here.

        California substantially broadened potential liability under CFCA, effective in

January 2010.  Those changes generally conformed the CFCA to changes to the FCA in the 2009

_____

            to acknowledge receiving the FX policies and procedures that apparently contained this
            disclosure.  Further, they conclusorily allege that this document did not affect defendants'
            obligations.

[54]
            *State v. Altus Finance, S.A.*, 36 Cal. 4th 1284, 1296 (2005) (internal quotation marks
            omitted).

[55]
            *San Francisco Unified School Dist. ex rel. Contreras v. Laidlaw Transit, Inc.*, 182 Cal. App.
            4th 438, 446 (2010) (internal quotation marks omitted).

[56]
            *Altus Finance*, 36 Cal. 4th at 1299 (internal quotation marks omitted).

16

Fraud Enforcement and Recovery Act ("FERA").[57]  Defendants argue that the recent revisions do not apply here because the conduct at issue occurred before their January 1, 2010 effective date.[58]

Although plaintiffs'[59] complaints often quote from the 2010 version of the CFCA, neither opposition brief disputes defendants' contention that the prior CFCA version governs.  The Court therefore assumes, for purposes of this motion, that the recent revisions to the CFCA do not apply.

B.    *Section 12561(a)(1)*

Section 12651(a)(1) makes it unlawful to "[k]nowingly present[] or cause[] to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval."[60]  Plaintiffs contend that defendants are liable for presenting two different kinds of false claims: (1) monthly transaction statements and (2) monthly custodial invoices.

1.    *Transaction Statements*

Judge Alsup rejected the transaction statement theory on the ground that those

---

[57]
    P.L. 111-21, 123 Stat. 1617 (2009).

[58]
    LADWP Def. Mem. [DI 214] at 22.  Defendants expressly make this argument only with respect to liability under one particular subdivision of the CFCA, Section 12651(a)(4).  But the Court is aware of no reason to conclude that the applicability of the recent amendments would vary by subdivision.

[59]
    For convenience, throughout this section, the court refers to "plaintiffs" as including relator.

[60]
    CAL. GOV'T CODE § 12651(a)(1) (2009).

statements did not constitute "claims" under the CFCA.[61]  Two other state courts have reached the same conclusion with regard to parallel state false claims statutes.[62]  This Court agrees.[63]

The CFCA defines a "claim" to include any "request or demand for money, property, or services" from the state or political subdivision.[64]  But the statements of transactions cannot reasonably be construed as requests or demands.  They were accounting statements of past transactions that did not request or demand anything.

Plaintiffs contend principally that the statements functionally were requests or demands because plaintiffs had the right to object to the transactions and not remain liable for the trades.[65]  They correctly note that the CFCA was designed "to prevent fraud on the public treasury"[66] and "should be given the broadest possible construction consistent with that purpose."[67]  But even broad construction does not permit a court to ignore the text of the statute.[68]  The Court cannot

---

[61]

      *In re BNYM*, 851 F. Supp. 2d at 1196–97.

[62]

      *Schneiderman*, 2013 WL 4516209 at *25–26; *Commonwealth ex rel. FX Analytics v. Bank of New York Mellon Corp.*, 84 Va. Cir. 473 (2012).

[63]

      The Court thus need not reach defendants' other contentions for dismissal of this theory.

[64]

      CAL. GOV'T CODE § 12650(b)(1) (2009).  The definition was amended effective January 1, 2010, but in no way that either party contends is meaningful here.

[65]

      LACERA Opp. 26; LADWP Opp. 26.

[66]

      *Altus Finance,* 36 Cal. 4th at 1296.

[67]

      *Contreras*, 182 Cal. App. 4th at 446 (internal quotation marks omitted).

[68]

      *In re C.H.*, 53 Cal. 4th 94, 100 (2011) ("If the statute's text evinces an unmistakable plain meaning, we need go no further" (internal quotation marks omitted)); *cf. Hedges v. Obama*, 724 F.3d 170, 189 (2d Cir. 2013), *cert. denied*, 133 S. Ct. ___, No. 13-758, 2014 WL

18

stretch defendants' providing plaintiffs a right to object to a transaction as a "request or demand" for money, property, or services.

The structure of the CFCA is enlightening as well.  In Section 12651(a)(4), the legislature specifically contemplated the possibility that a defendant might be liable—even in the absence of a "claim"—when it "[h]as possession, *custody*, or control of public property or money" and fails to deliver all of that property.[69]  Moreover, in Section 12651(a)(7), known as the reverse false claims provision, the CFCA permits liability in certain circumstances where a defendant unlawfully conceals, avoids, or decreases an obligation to provide money or property to the government.  Thus, the legislature was well aware that liability may be appropriate even in the absence of any request or demand.   But the fact that it provided for liability in certain of these circumstances under Sections 12651(a)(4) and (7) serves to confirm that no liability was intended under Section 12651(a)(1) in the absence of a claim.[70]

In so holding, the Court does not require plaintiffs to allege an *explicit* request or demand.  Surely Sections 12651(a)(1) and (2) do not require a formal invoice for liability to attach;

---

1659886 (U.S. filed Apr. 28, 2014); *United States v. Coppola*, 671 F.3d 220, 240 (2d Cir. 2012).

[69]

Emphasis added.

[70]

Plaintiffs' reliance on outdated federal authorities warrants no different conclusion.  In *United States v. McLeod*, 721 F.2d 282 (9th Cir. 1983), and *Scolnick v. United States*, 331 F.2d 598 (1st Cir. 1964), the courts concluded that knowingly cashing a mistakenly issued check constituted a false claim.  These decisions were issued prior to 1986, when the federal FCA first defined a claim to be a "request or demand" and first introduced the reverse false claims provision.  *See* 31 U.S.C. § 3729(b)(3) (recently amended version of FCA making clear that "obligation" for purpose of reverse false claims liability included duty arising from retention of overpayment); *see also Schneiderman*, 2013 WL 4516209, at *26 (reasoning that endorsement of check would constitute the requisite claim in such circumstance).

19

conduct amounting to an implicit request may be sufficient.[71]  But that is not this case.  At the time these statements were issued, the accounts already had been debited and there was nothing further to demand.

Finally, plaintiffs argue that the statements were implicit requests because "they induced [plaintiffs] to continue paying out money through the Standing Instruction service."[72]  The point merits little discussion.  Any behavior on plaintiffs' part the statements may have induced is irrelevant to whether the statements themselves were implicit or explicit requests or demands.

### 2.   Custodial Invoices

The Court thus turns to plaintiffs' new theory, which has not been addressed by any other court—that their monthly custodial invoices constituted "false claims" under the CFCA.[73]  In moving to dismiss the Section 12651(a)(1) count as to this theory, defendants do not dispute that these invoices constituted claims.  Rather, they challenge whether (1) the alleged false claims have been alleged with particularity as required by Fed. R. Civ. P. 9(b), (2) plaintiffs sufficiently have alleged that the invoices were false, and (3) plaintiffs adequately have alleged *scienter*.

Plaintiffs advance four separate theories as to why the custodial invoices were false.

---

[71]

       *See United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995) (addressing circumstance under federal FCA in which defendant did not submit an invoice but "its goal of receiving payment was implicit in the submission of the goods").

[72]

       LADWP Opp. at 26; LACERA Opp. at 26.

[73]

       None of the prior courts considering whether defendants are liable under various state false claims acts for their standing instruction service has been presented with this theory of liability.

> a.    *False on Their Face*

Plaintiffs contend first that the custodial invoices were false on their face because they allegedly "represented to Plaintiff[s] a flat-fee for [BNY Mellon's] services but failed to disclose the significant amount of additional moneys Plaintiff[s] paid over to the Bank through Standing Instruction FX services."[74]  Furthermore, plaintiffs allege that the invoices were false on their face "because they led [plaintiffs] to believe that these were the complete and total amounts billed to Plaintiff."[75]

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud."[76]  This requires a plaintiff to "adequately specify the statements it claims were false or misleading, give particulars as to the respect in which the plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements."[77]  Plaintiffs do not dispute that Rule 9(b) applies here.[78]

Plaintiffs' pleadings as to this theory fall well short.  Plaintiffs allege substantially nothing about the text of the custodial invoices.  They fail to identify a single statement in any of the invoices that arguably was false or even misleading.  Given that plaintiffs allege that they

---

[74]    LACERA Cpt ¶ 187; LADWP Cpt ¶ 185; Relator Cpt ¶ 184.

[75]    LACERA Cpt ¶ 188; LADWP Cpt ¶ 186; Relator Cpt ¶ 185.

[76]    FED. R. CIV. P. 9(b).

[77]    *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (internal quotation marks omitted).

[78]    *See Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476–77 (2d Cir. 1995) (concluding that Rule 9(b) applied to pleading violations of the federal FCA).

received these invoices regularly, it is particularly reasonable to have expected more here.

Plaintiffs' inadequate pleadings would warrant dismissal under Rule 8 as well. Plaintiffs' allegations do not explain how defendants' invoicing of a flat custodial fee plausibly could have misled plaintiffs into believing that defendants were forswearing the ability to make additional compensation from the relationship. Plaintiffs' subjective beliefs are irrelevant absent a plausible basis to conclude that the beliefs were reasonable and induced by the statements in question.

### b.    Underpinned by Fraud

Plaintiffs' failure to allege any falsity on the face of the invoices does not end the matter. Some California courts have recognized that "the claim itself need not be false but only need be underpinned by fraud."[79] For example, liability exists when the government pays on a claim under a contract that "'was originally obtained based on false information or fraudulent pricing.'"[80] These CFCA cases draw directly from federal cases recognizing a "fraud-in-the-inducement" theory of false claims liability.[81] The underlying principle is that fraud inducing a contract does "'not spend itself with the execution of the contract.'"[82] Rather, the "'taint'" of the fraud enters into each

---

[79]    *City of Pomona v. Superior Court*, 89 Cal. App. 4th 793, 802 (2001); *accord Contreras*, 182 Cal. App. 4th at 448.

[80]    *Pomona*, 89 Cal App. 4th at 802 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787 (4th Cir. 1999)).

[81]    *Harrison*, 176 F.3d at 787.

[82]    *Id.* (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543 (1943)).

subsequent claim for payment the fraudster thereafter makes upon the government.[83]  The Fourth

Circuit has synthesized this theory as requiring proof of four elements: "(1) whether there was a

false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter;

(3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due

(*i.e.*, that involved a 'claim')."[84]

Plaintiffs allege a number of different fraud theories.  The Court takes them in turn.[85]


i.      *Best Execution*

The Court considers first whether plaintiffs adequately have alleged that the custodial

invoices were underpinned by fraud due to defendants' "best execution" representations—a theory

sustained under the federal mail and wire fraud statutes in *DOJ*.  Defendants principally challenge

this theory for failing to allege inducement or reliance.[86]

---

[83]

    *Id.* (quoting *Hess*, 317 U.S. at 543).

[84]

    *Id.* at 788.

[85]

    *See, e.g.*, LACERA Cpt ¶ 184.

    BNY Mellon suggests that the Court need not undertake this analysis because plaintiffs'
failure to attach a copy of a custodial invoice or specify any invoice's precise contents
warrant dismissal of this theory under Rule 9(b).  The Court disagrees.  Under the fraud-in-
the-inducement theory, the circumstances constituting the relevant fraud are the statements
and omissions inducing payment of the invoices.  The content of the invoices themselves
is peripheral, at best.

[86]

    Defendants contend also that CFCA claims must be grounded in an "objective falsehood,"
whereas federal mail fraud requires only that the statement be misleading.  *See United
States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008).  But
plaintiffs do not contend merely that "best execution" was misleading.  Rather, they allege
that the term had an industry meaning objectively inconsistent with defendants' pricing
practices.  The Court thus need not consider whether the CFCA incorporates a stricter

23

Each plaintiff alleges that "[h]ad Plaintiff known of Defendants' real conduct with respect to executing FX transactions, Plaintiff would not have continued to vest Defendants with the heightened level of trust exhibited in its custodial relationship and carried out through Standing Instruction."[87]   Each plaintiff further alleges that defendants' false and fraudulent representations—including its statements about best execution—"induced Plaintiff to maintain the *status quo* with respect to its custodial relationship with Defendant and induced it to continue utilizing Standing Instruction as part of this relationship."[88]

Defendants argue that these allegations are insufficient because plaintiffs nowhere allege that the fraud induced the original contract—they contend that "[p]laintiffs must allege that BNYM made misrepresentations about [the] standing instruction service which caused the Funds *to retain BNYM as custodian*."[89]   Because plaintiffs do not allege that the representations at issue were even made before they first initiated their custodial relationships with BNY Mellon, defendants continue, the allegations are insufficient.

Defendants' narrow understanding of the fraud-in-the-inducement theory has little to recommend it, and the Court rejects it.   As the Fourth Circuit has described it, the critical question

---

falsity standard than federal mail fraud.  *See Contreras*, 182 Cal. App. 4th at 450 n.9 (questioning *Wilson* and suggesting that concerns it raises are better addressed through CFCA's *scienter* provisions).

[87]

> *See, e.g.*, LACERA Cpt ¶ 182.

[88]

> *Id.* ¶ 183.

[89]

> LADWP Def. Mem. at 17 (emphasis in original); LACERA Def. Mem. at 17 (emphasis in original).

is whether the fraudulent conduct "caused the government to pay out money."[90]  It is axiomatic that Section 12651(a)(1) "attaches liability, not to the underlying fraudulent activity, but to the *claim for payment*."[91]  Plaintiffs may hold defendants liable if defendants fraudulently induced the payment of individual custodial invoices, even if the representations postdated the original relationship.

In assessing whether the fraud induced payment of the invoices to create CFCA liability, it is natural to consider California's "actual reliance" standard for common law fraud in the inducement claims.[92]  The misrepresentation need not be "the sole or even the predominant or decisive factor in influencing [plaintiff's] conduct."[93]  It is sufficient if a misrepresentation is a "substantial factor" in the decision.[94]  An inference of reliance arises if the misrepresentation was material.[95]  Moreover, when plaintiff "alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements."[96]  Finally, where the fraud is an omission, "[o]ne need only prove that, had the omitted information been disclosed one would have been aware of it and behaved

---

[90]

    *Harrison*, 176 F.3d at 788.

[91]

    *United States ex rel. Onnen v. Sioux Falls Ind. Sch. Dist. No. 49-5*, 688 F.3d 410, 414 (8th Cir. 2012) (emphasis added) (internal quotation marks omitted).

[92]

    *Engalla v. Permanente Medical Grp., Inc.*, 15 Cal. 4th 951, 976 (1997).

[93]

    *Id.* at 977.

[94]

    *Id.*

[95]

    *Id.*

[96]

    *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009).

differently."[97]

Defendants therefore overreach in arguing that plaintiffs' payment of custodial fees after the alleged fraud was revealed forecloses inducement as a matter of law. This argument may persuade at summary judgment or trial, but does not carry the day now. Moreover, at least certain plaintiffs allegedly were billed individual transaction fees for each standing instruction trade.[98] Plaintiffs allege that they stopped using standing instruction once they learned about defendants' practices.[99] Plaintiffs may seek to establish that payment of these individual transaction fees, even if not that of the overall custodial fees, was induced by fraud.

Nevertheless, plaintiffs' allegations are conclusory and insufficient. Nowhere do plaintiffs allege that they or their agents reviewed the web page on which the "best execution" representation was made[100] or even that they or their agents otherwise were aware that defendants

---

[97]

*Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993).

[98]

Defendants vigorously dispute that they ever charged such fees. This is a curious dispute, as it would seem objectively ascertainable to all parties whether such fees were being charged. In any event, plaintiffs' allegations as to this purely factual matter must be taken as true at this stage. To the extent that defendants believe that plaintiffs' counsel can have no good-faith basis for this allegation, there is other relief they may seek at the appropriate time.

[99]

*See, e.g.*, LACERA Cpt ¶ 182.

[100]

*See In re Lehman Bros. Sec. and ERISA Litig.*, 903 F. Supp. 2d 152, 191 (S.D.N.Y. 2012) ("Nowhere does any plaintiff allege, however, that it ever read any of the Offering Documents and relied on the alleged misrepresentations contained in those documents in making its decision to purchase Lehman securities, as is required to sustain a claim for fraud under California law." (citing *Murphy v. BDO Seidman, LLP*, 113 Cal. App. 4th 687, 701 (2003))); *cf. Small v. Fritz Cos.*, 30 Cal. 4th 167, 184 (2003) (requiring specific allegations of reliance to mount a securities holder claim).

had been representing their service as providing best execution.[101]   Plaintiffs allege that they would have acted differently had they known of defendants' conduct.  But this allegation would answer the wrong question if plaintiffs had no right to know about defendants' pricing practices in the first place.  Absent adequate pleading of a duty to disclose independent of the "best execution" representation,[102] plaintiffs must allege at a minimum some *ex ante* awareness of the representation that could permit the inference that it was a substantial factor in their payment of the invoices.[103]

ii.      *Fraudulent Omissions*

Plaintiffs next allege that defendants fraudulently omitted their markups and time stamps on trades.[104]  In *DOJ*, this Court made clear that such a theory is deficient in the absence of any fiduciary relationship; defendants were under no obligation to disclose such information in an arm's-length transaction.[105]  This is dispositive as to TCERS and SBCERS, which nowhere allege the existence of a fiduciary relationship with defendants.

Nor have LACERA or LADWP alleged facts sufficient to establish such a duty to disclose.  They were not acting in a fiduciary capacity as to standing instruction trades.  While the

---

[101]

See *Murphy*, 113 Cal. App. 4th at 702–3 (setting forth circumstances in which plaintiffs may plead indirect reliance).

[102]

The Court addresses duties to disclose in the next subsection.

[103]

The Court emphasizes that it expresses no view about how much need be alleged to clear this bar.  *See Murphy*, 113 Cal. App. 4th at 698–701 (setting forth pleadings of reliance that suffice).  It holds only that the present allegations are insufficient.

[104]

*See, e.g.*, LACERA Cpt ¶ 184.

[105]

941 F. Supp. 2d at 469, 482-83.

Court has allowed them to proceed on claims of breach of fiduciary duty with respect to certain alleged misrepresentations and nondisclosures, neither LACERA nor LADWP has sought to explain how that would give rise to a duty to disclose the omissions of which they complain—markups and time stamps.

### iii.    Remaining Theories

Plaintiffs allege that defendants fraudulently "assign[ed] fictitious FX rates to currency trades as exhibited in reports and statements."[106]  This is not a viable independent theory of fraud.  Asserting that the rates are "fictitious" merely begs the question—as opposed to what allegedly "real" rates?  "The Bank did not misrepresent the rates for the FX transactions.  It is conceded that the rates [BNY Mellon] charged were accurately reflected on monthly account statements."[107]  Perhaps plaintiffs mean that the rates were represented to be best execution rates but were not.  In such a case, the fraud would be the "best execution" representation, not the rates.

Plaintiffs allege that defendants fraudulently represented that they would offer competitive rates.[108]  This Court already has concluded this allegation fails to state a breach of contract claim.  It certainly does not state a claim for fraud.

LACERA and LADWP, but not relator, allege that BNY Mellon fraudulently represented during the RFP process that it would act as a fiduciary and safekeep and accurately

---

[106]

        *See, e.g.*, LACERA Cpt ¶ 184.

[107]

        *See La. Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co.*, No. 12 Civ. 6659 (DLC), 2013 WL 3357173, at *9 (S.D.N.Y. July 3, 2013).

[108]

        *See, e.g.*, LACERA Cpt ¶ 184.

report the fund's assets.[109]  Even assuming that plaintiffs allege a breach of any of these duties, they fail to allege that these representations knowingly were false when made, in 1994 for LACERA and in 2004 for LADWP.[110]

Finally, plaintiffs fail to allege that defendants' representations regarding netting amounted to fraud for the reasons explained in *DOJ*.[111]

### c.    Implied Certification

Under this theory, a contractor's submission of a claim for payment is understood to be an implicit certification that it has complied with certain contractual or regulatory requirements.[112]  Accordingly, courts have held that a contractor may be held liable for submission of a false claim if it "submit[s] claims for payment while knowing that it has violated contractual provisions that are material to the government's decision to pay."[113]  As a California intermediate court has explained, "[i]t is reasonable for governmental entities to assume that contractors seeking payment are in compliance with the material terms of their contracts."[114]  If the contractor cannot comply and informs the government, then CFCA liability is unwarranted.  "But if that same

---

[109]

See, e.g., LACERA Cpt. ¶ 184; LADWP Cpt. ¶ 182.

[110]

LACERA Cpt ¶ 122; LADWP Cpt ¶ 123.

[111]

*DOJ*, 941 F. Supp. 2d at 478-79.

[112]

*See generally Contreras*, 182 Cal. App. 4th at 447–53 (citing cases).

[113]

*United States v. Sci. App. Int'l Corp.*, 626 F.3d 1257, 1267 (D.C. Cir. 2010) ("*SAIC*") (emphasis omitted).

[114]

*Contreras*, 182 Cal. App. 4th at 453.

29

contractor is aware of the noncompliance and chooses to seek payment without informing the government, then it is a fraud appropriately within the scope of the CFCA."[115]

Plaintiffs contend that in submitting the custodial invoices, defendants impliedly and falsely certified that they complied with alleged contractual obligations to (1) provide best execution, (2) provide competitive rates, (3) provide netting, and (4) generally act for the benefit of its custodial clients.

Plaintiffs' allegations fail.[116]  In these cases, the defendant's submission of a claim is wrongful because it seeks payment which it knows it does not deserve, as the defendant failed to comply with material contractual conditions.  The problem here is that plaintiffs have not alleged that defendants knew, or were reckless in not knowing, that they were obligated contractually to provide best execution, let alone that this condition was material.  The Court upheld plaintiffs' breach of contract claims in *SEPTA* and in this case only because, after a careful reading, it was plausible that language on certain forms incorporated into the contract a webpage promising best execution.  It is at least equally plausible that the best execution representation was not incorporated. What exactly was incorporated is the "imprecise contractual provision"[117] prompting "differences in interpretation growing out of a disputed legal question"[118] that courts have held cannot be the

---

[115]

    *Id.*

[116]

    The Court need not reach defendants' arguments based on *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001).

[117]

    *Wilson*, 525 F.3d at 378.

[118]

    *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999).

30

basis of liability under the federal FCA.[119]

Thus, even assuming that plaintiffs adequately have alleged that defendants knowingly failed to provide best execution contrary to their representations, they have not alleged that defendants knowingly failed to provide best execution contrary to their material contractual obligations. The difference is critical. In the former case, defendants may be liable for common law fraud and breach of fiduciary duty. They may even be liable under Section 12651(a)(1) if the fraud was part of a wrongful scheme to induce the government to pay on a claim. But only in the latter case would the defendants' submission of a claim constitute a wrongful implied certification.

None of plaintiffs' other purported breach of contract claims warrants a different conclusion. The netting provision theory suffers the same defect as best execution. The Court has rejected outright a breach of contract claim predicated on "competitive rates." Finally, the Court rejects plaintiffs' implied certification claim premised on defendants' alleged failure to act in their best interests. The extent to which defendants were obligated to do so is a disputed legal question, and plaintiffs have not alleged that defendants knew that their conduct violated their contractual obligations.

d.    *Fraudulent Underbidding*

LACERA and LADWP contend that the custodial invoices were false on a theory of

---

[119]    This does not mean that contractual requirements must be crystal clear to create false claims liability. Where the defendant advances its interpretation in bad faith, or perhaps even when it is aware of a sufficiently high risk that its interpretation is wrong, then it may act recklessly by seeking payment without disclosing the potential dispute. Plaintiffs have not alleged facts sufficient to conclude that this is such a case.

"fraudulent underbidding."[120]

In *Hooper v. Lockheed Martin Corp.*,[121] the Ninth Circuit recognized that a contractor can be liable under the federal FCA when it knowingly underestimates the potential cost of a project in order to win the business and then charges more for the work once completed. The initial underbid is deemed a false claim.

Plaintiffs here allege that BNY Mellon reduced its fees for custodial services to win the business, anticipating that it could make much more from plaintiffs through standing instruction FX trades.[122] Plaintiffs thus allege that the custodial invoices were false because "the [d]efendants' proposal d[id] not disclose the amount the Defendants intend to secretly earn from [plaintiffs]."[123]

The analogy to *Hooper* is not apt. A critical component of liability in *Hooper* was that the initial bid was supposed to reflect the contractor's good-faith estimate of the cost of the project. The contractor was liable because it knowingly understated this amount. But this case is more analogous to *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*[124] There, the D.C. Circuit rejected an underbid theory because "[t]he disputed bid in this case did not purport to be an opinion or an estimate; rather, [the] bid was merely an offer to enter into a contract" at a certain price. A razor company may lower the price of its razor to sell high-priced blades. A smart

---

[120]

Relator (on behalf of TCERS and SBCERS) does not advance this theory.

[121]

688 F.3d 1037, 1049 (9th Cir. 2012).

[122]

*See, e.g.*, LACERA Cpt ¶¶ 87–88.

[123]

*See, e.g.*, *id.* ¶ 193.

[124]

393 F.3d 1321, 1328 (D.C. Cir. 2005)

phone maker may reduce the price of its phones and then charge for an expensive data plan.  A company does not commit fraud merely by lowering its prices to develop customer relationships in anticipation of further business in the future.

     C.     *Section 12651(a)(2)*

     Plaintiffs' Section 12651(a)(2) count also requires that they allege that defendants' submitted a false claim.  As discussed above, plaintiffs have failed to do so.[125]

     D.     *Section 12651(a)(4)*

     Section 12651(a)(4) renders liable one who "[h]as possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less property than the amount *for which the person receives a certificate or receipt*."[126]  Defendants move to dismiss on the ground that plaintiffs have failed to allege any "certificate or receipt" within the meaning of the provision.  Plaintiffs rejoin that when they paid the custodial invoices, they "submitted money to the Bank confirming the total amount of money to which the Bank was entitled.  These payments were certificates and/or receipts to the Bank because they demonstrated the total amount of money owed to the Bank."[127]

     Plaintiffs' argument borders on the nonsensical.  The "certificate or receipt"

---

[125]

     The Court notes further that while plaintiffs allege that BNY Mellon falsely represented that it would price transactions within a "range of the day," LACERA Cpt ¶ 200, it cites no such representation with particularity.

[126]

     CAL. GOV'T CODE § 12651(a)(4) (2009) (emphasis added).

[127]

     *See, e.g.*, LACERA Cpt ¶ 210.

quantified property in the "custody" of BNY Mellon in order to judge whether the amount of property returned by BNY Mellon to plaintiff was proper.[128]  It plainly was not a quantification of what plaintiffs think BNY Mellon's fee should be.


       E.      *Section 12651(a)(7)*

      As relevant here, Section 12651(a)(7) imposes liability on one who "[k]nowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision."[129] In particular, plaintiffs allege that "[t]he Bank utilized fictitious FX pricing in their statements and reports to Plaintiff[s] in order to conceal an obligation to remit moneys due and owing to [Plaintiffs]."[130]

      The Court assumes, contrary to defendants' contentions, that the term "obligation" encompasses defendants' alleged contractual obligation to provide best execution in this case.[131]

---

[128]

      There is little law regarding the contours of this requirement in either the CFCA or the federal FCA.  *See United States ex rel. Aakhus v. Dyncorp, Inc.*, 136 F.3d 676, 681 (10th Cir. 1998) (concluding that certificate or receipt "must be created by the government," "must have some connection or relationship to the defendant's return of property," and "must indicate how much property defendant allegedly returned to the government").

[129]

      CAL. GOV'T CODE § 12651(a)(7) (2009) (emphasis added).

[130]

      *See, e.g.*, LACERA Cpt ¶ 216.

[131]

      *See United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1202 (10th Cir. 2006); *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237–38 (11th Cir. 1999).

      The Court considers only the contractual obligation because, as noted above, plaintiffs have not alleged adequately that defendants had an independent fiduciary duty to provide best execution pricing.

Nevertheless, plaintiffs' allegations fall short.  Plaintiffs must allege that defendants "knowingly" engaged in the conduct proscribed by Section 12651(a)(7).  It is natural to read this provision as therefore requiring that defendants have known, or have been reckless in not knowing, that they had such a contractual obligation in the first place.  As discussed in the context of implied certification, plaintiffs have not done so.[132]

## IV.   Fraud by Concealment

The allegations of LACERA and LADWP regarding their fraud by concealment counts could not be more general.[133]  They allege that defendants failed to disclose "important facts" and disclosed "some facts" while failing to disclose "other important facts," making the disclosure deceptive.[134]

The Court recognizes that "Rule 9(b) does not require that the complaint explain the plaintiff's theory of the case, but only that it state the misrepresentation, omission or other action or inaction that plaintiff claims was fraudulent."[135]  Nevertheless, it is not at all apparent what specific "facts" plaintiffs contend they should have been told or which disclosed facts made the failure to disclose other unstated facts deceptive.  While plaintiffs enumerated specific representations and omissions in the context of the CFCA counts, their common law fraud counts

---

[132]

A New York court has rejected an equivalent reverse false claim count on the same ground.  *See Schneiderman*, 2013 WL 4516209, at *29 (dismissing claim because "plaintiffs' very claim as to the existence of a breach is the subject of a bona fide dispute").

[133]

LADWP Cpt ¶¶ 231–39; LACERA Cpt ¶¶ 234–42.

[134]

LADWP Cpt ¶ 237.

[135]

*Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 523 (7th Cir. 1993).

are separate bases of liability.  The Court and defendants are entitled to specific notice as to the facts underlying plaintiffs' common law claims.  In any event, plaintiffs' claims fail for the same reasons as the CFCA fraud-in-the-inducement claims failed.

V.     *Section 17200*

      Defendants may be held liable under Section 17200 if their actions were unlawful, unfair, *or* fraudulent.[136]  The complaints allege only that defendants' actions were unlawful for violating the CFCA.  As plaintiffs have failed to allege such a violation, plaintiffs do not state a claim under this prong.[137]  Similarly, plaintiffs fail to allege a claim under the fraudulent prong.[138]

      Finally, plaintiffs contend that defendants' practices were unfair.  As a number of courts have recognized, California law regarding what constitutes an "unfair" practice under this statute is in considerable disarray.[139]  Plaintiffs concede that the "unfair" prong is "tethered to some legislatively declared policy" and assert that defendants' conduct violates the policy against

---

[136]

      *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

[137]

      The Court expresses no view regarding whether plaintiffs could allege unlawful conduct in light of this Court's conclusion in *DOJ* that the federal government adequately alleged claims that BNY Mellon was liable for mail and wire fraud.  *See People ex rel. Trutanich v. Joseph*, 204 Cal. App. 4th 1512, 1525 (2012) ("The unlawful practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made . . . . [S]ection 17200 borrows violations of other laws and treats them as unlawful practices independently actionable under section 17200 et seq.").

[138]

      *In re Tobacco II*, 46 Cal. 4th at 326 (concluding that plaintiffs needed to show actual reliance to establish standing under fraud prong of Section 17200).

[139]

      *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256-57 (2010) (discussing three different tests that have been applied).

36

committing fraud against the government.[140]

A practice need not violate another law to be deemed unfair.[141]  Plaintiffs, however, provide no framework for this Court to assess whether defendants' conduct may have been unfair even if it fell short of being fraudulent.  In light of the disposition of the rest of these motions, the Court concludes that it would not be an efficient use of judicial resources to determine whether defendants' practices could be deemed unfair if not unlawful or fraudulent.  For now, it suffices to note that plaintiffs contend only that the practices were unfair because they were fraudulent, but they have failed to allege that the practices are fraudulent.  The claim is dismissed.


VI.    *Claims Against BNY Mellon Corp.*

Defendants move to dismiss claims against BNY Mellon Corp., contending that plaintiffs have not alleged that they had any relationship with BNY Mellon Corp., as opposed to its subsidiaries like BNY Mellon and BNY Mellon Trust Company.  Plaintiffs respond only that every allegation in the complaint includes BNY Mellon Corp. as well as its subsidiaries and its affiliates.  This is insufficient.  Plaintiffs may not evade their obligation to plead specific claims against specific defendants by generalized pleading.  All claims against BNY Mellon Corp. will be dismissed.


*Conclusion*

For the foregoing reasons, defendants' motions to dismiss [12 MD 2335 DI 167, 12

---

[140]

*Cel-Tech Commc'ns*, 20 Cal. 4th at 186.

[141]

*Id.* at 181.

37

Civ. 8990 DI 4; 12 MD 2335 DI 213, 12 Civ. 3064 DI 108] are granted in all respects as to BNY

Mellon Corp. and granted in all respects as to the other defendants save, with respect to the other

defendants, that they are denied insofar as LACERA and LADWP assert the claims sustained in

*SEPTA*—that is, claims for (1) breach of contract premised on defendants failure to provide "best

execution," and (2) breach of fiduciary duty premised on certain alleged misrepresentations and

nondisclosures.  LACERA, LADWP, and relator may move for leave to amend provided that any

such motion shall be filed no later than June 15, 2014

            SO ORDERED.

Dated:        May 1, 2014

                                  Lewis A. Kaplan
                              United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)